will be your argument in In Re Rajagopalan, number 20-1956. Mr. Green. Good morning, Your Honor. Good morning. I get to please the Court. I am starting my discussion going to the patent, Claim 1, which is available within the inside first page of our initial presentation. And I think it's important to take a look at this reasonably carefully, because it's quite specific in what is required by this claim. It requires, among other things, an effective amount of an organoleptic excipient. And there's been a list of those excipients that's shown. And it goes on to say that what needs to then be accomplished is, in the context of this product, it's referenced in this, to be used in a reduction action that comprises alkali metals, zinc, and phosphorus. So this is all a combination of what's actually required to exist in order to have this claim declared not patentable. Now if we take a look at the opening brief, I guess the easiest way I can put this is, I've read through this argument that the claim is not patentable. And to me it's like an apples and oranges situation, because the underlying alleged basis here for why it's not patentable goes to this combination of Geomaldra with atoms. And the Geomaldra discussions all then tie back to what's in, obviously, what was an application became a patent. So in Geomaldra, the background of it does not indicate much about anything as to what Geomaldra actually did. But on this combination question, why aren't the several things that are in paragraph 52 of Geomaldra quite strongly supportive of the board's finding? Am I remembering that that's the kind of key paragraph in which the opening sentence says, most of it is about causing a real unpleasant stink. But that opening sentence is about if you have enough of the odorant, you can actually inhibit the reduction, the chemical reaction, which is what your claim is about. And then later in the paragraph, while talking about the bad odor property, nevertheless, it refers to specific odorant parenthesis standard flavorant, and I thought it was undisputed that Adams says that what Adams is discussing is the most common flavorant, and it is actually one that is within the compass of your claim one. You are correct with respect to Adams. I'd say if you read 52, appendix 641, what does it say? It says, well, okay, if you add, say, 100 parts of the synthetic amine and the specific odorant, this inhibition can take place. What's a specific odorant? There's no discussion. Well, except, what, three or four sentences later is where it says where a specific odorant, e.g., a standard flavorant, is used. And that's, of course, at the second part of the discussion of 52, and that's using lower levels of the composition at that time, and that's where it says it can impart a strong odorant. But even in that case, what is the standard flavorant that's being used? But again, in that context, it's really not being used in the variation that's in the first part of paragraph 52, because that's very specific about using this larger amount of the amine being also hooked up then with the amount that they're suggesting here to be used for the specific odorant. But how does the person of ordinary skill in the art know what is supposed to be done in that case? What specific odorant in order to achieve the, not just a smell, which is what is discussed at the bottom of 52, but what's not discussed at the top of 52? And- Mr. Green? Paragraph- I'm sorry. Go ahead. No, you go ahead. All right. Paragraph 53 then follows up paragraph 52, this is reading in Giamalva, by referring to the odorant being volatile amines. So we're narrowing in on the category of specific odorants, i.e. standard flavorants or e.g. standard flavorants. So we're talking about amines. And one very conspicuous amine was identified as acetyl pyrazine. Why isn't that close enough so that a person of skill in the art wouldn't understand that Adams plus Giamalva would teach that combination that is described in the patent or the application? Well, Your Honor, even if you went so far as to say that that would be the case to a combination, it still doesn't get you up to what's up on 52, because now here we're talking about a specific odorant and there's no discussion then as to what is actually being used with respect to the initial step that they were talking about in 52, which is using that larger amount in that formulation. But, you know, even at that point, where is it that a person of ordinary skill in the art is to understand that this is going to work? There's nothing in this entire specification of Giamalva that shows that any of this took place in the way of any actual showing. Not there. So your argument is that Giamalva is not enabled? It's not at all from the standpoint of dealing with this issue in the scope of Claim 1. It's not there. And if you look at- Mr. Green, as I understand it, you didn't present any expert declarations or other evidence that would indicate how and why there could be problems or there very likely would be at sufficiently high levels in order to inhibit this kind of a reaction. Am I right? There is none submitted in this situation. That is true. I agree with that. You know, I guess what my question is, why isn't what is contained here sufficient to make a prima facie case of obviousness that in that respect would then mean it would be your turn to rebut that prima facie case with whatever evidence that you could marshal to explain away the theory behind the prima facie case? Well, I think the patent application of Giamalva actually speaks for itself from that standpoint, because it goes through and uses terms like it can inhibit this or inhibit that. But at the end of the day, it's not there. There is nothing in that at all that states that if you use any of these formulations, you know, that it's actually going to work. The inhibit is something that is just lying out there. And there is no-if you look at what they did do, and maybe this would help, if you take a look at what occurs in the-let's see-the section dealing with the conversion. So the extractions, like it's APX 642, and we've got the extractions of the pseudo-alpha using a steam distillation that's taking place. And in that formulation, or in that testing that's done, you've got exhibits two, three, four, and five. Out of those, you do find there's actually one amine in there that's being used.  It's not doing any type of a-anything other than the extraction. So in other words, it's not taking a position from the standpoint of what occurs in this section to show that there was anything that was done that actually inhibited the transaction or the transmission of the pseudo-alpha and switching around so that you're, you know, getting your methamphetamine. I mean, that's not going on. Well, the inhibition, I take it, is the interference with the process of reducing the pseudo-alpha. Is that-that is what we're talking about in the inhibition, I take it, as opposed to the isolation. Yeah, the inhibition. That's right. Yeah, right. Okay. Paragraph- It's about that. Yeah, paragraph five of Gemalva talks about interfering with efforts to produce illegal drugs, and then paragraph 17 more specifically says the additive inhibits reduction of the sympathomimetic and-I mean, and or its derivatives. Isn't that saying exactly what it is that the inhibition is all about? Preventing the reduction of the pseudoephedrine? We're looking at seven- Five and 17 are the two paragraphs that seem to me to be pertinent here. All right. And then 46 as well, talking about interference with the reduction to methamphetamine by competing-here's the specific mechanism-competing with pseudoephedrine for the reducing agent. That seems to be about as complete a description of the reaction as would be necessary, don't you think? So, yeah, when you're looking at the Gemalva inhibition reduction, like, for example, 17, okay, so in some embodiments, the additive inhibits reduction of the sympathetic amines, e.g., pseudoephedrine, and or its derivatives. Okay, it says that. I agree with that. And 46 then describes the reaction in some detail. About four lines down in paragraph 46, five lines down. In 46. Okay, in 46 where it starts with these additives? Yeah, about five lines down. That's the description of the reaction. Okay. So what-okay, so what does 46 say? The additives can be further characterized by an ability to reduce the overall potency of the drug. Reduction in potency of the mixture can be affected by mere dilution alone or by interference with reduction to methamphetamine. Okay, interference with reduction. By competing with the pseudoephedrine for the reducing agent. That's the reaction that is at the core of this function, it seems to me. All right, I would agree. What additive is it that's going to accomplish this? Well, I think that's where you go into paragraph 52 and paragraph 53. Jamal doesn't say acetylpyrazine, but of course, if it did, then this would be an anticipation case. Right, I would agree with that. Again, yeah, you have in 52, you have, again, the statement we just talked about that says that if you use the specific odorant, you'll get that. Now, there's no specific odorant that, again, is identified for use in 52. In fact, there's nothing in this entire specification that tells a POSA what to do with this, other than how to deal with examples two, three, four, and five, which they do show, which has nothing at all to do with anything other than being able to take the product that contains the formulation as you need to be extracted, and it's pseudoephedrine that's there, that it's coming out, but that's all that's happening. And it's going through, I see I'm missing my time on this, but it's going through a method that, again, has nothing to do with inhibition. It's actually cleaning it out at that point in time, so you have the pseudoephedrine, but there's nothing in it that teaches anything more than that. Mr. Green, why don't we hear from Mr. McBride, and we'll restore your three minutes of rebuttal time. I appreciate that. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Your Honors, this case involves a fairly straightforward obviousness rejection based on the combination of two references, G.M. Alva and Adams, that involves a simple substitution. I think, as Your Honors have pointed out, G.M. Alva does a fairly good job of describing the problem to be solved, which is preventing over-the-counter medications that contain pseudoephedrine from being misused to illegally convert the pseudoephedrine to methamphetamine. G.M. Alva describes two pathways. One is to create the bad odor, where you add the amine odorant in a small amount, and this other pathway, where you add a larger amount of the amine odorant to actually chemically inhibit the reaction that converts the pseudoephedrine to the methamphetamine. I believe Roger Gopalan's counsel conceded that G.M. Alva does disclose both of those pathways, and it's described, as you pointed out, in paragraphs 5 and 17 and 46, and also in paragraph 52. I'd also just like to point out that paragraph 52, in addition to just pointing out the pathway that you can add this larger amount, it goes on to disclose the 100 parts additive to 100 parts of the pseudoephedrine is the ratio that would actually allow you to inhibit that reaction, and that is also consistent, if you look at Roger Gopalan's specification in example 1 and also in table 1, they give one ratio. They use a one mole additive to one mole of the pseudoephedrine, and that's the only ratio they used. And so, G.M. Alva's disclosure of 100 parts additive to 100 parts pseudoephedrine is the same amount that Roger Gopalan is disclosing that works and constitutes this effective amount that's results in less than 25% of the methamphetamine being created. And also, if you look at paragraph 56, it makes another disclosure of the different amounts that you can use, the different ratios that you can use between the additive and the pseudoephedrine, and it says that the most preferred amount is a ratio of 2 to 1 to 1 to 2, and that's the ratio between the amine additive and the pseudoephedrine. And that's, you know, squarely within the range. It's consistent with the 1 to 1 ratio disclosed in Roger Gopalan's specification that results in this effective amount that can inhibit that chemical inhibition. And then, if you turn to the motivation to look to atoms, there's a number of different guideposts in G.M. Alva. You know, first, it talks about using a volatile amine odorant. It talks about using a specific odorant, which it describes as a standard flavorant. If you look at atoms, it discloses a number of standard flavorants. It discloses specifically acetylpyrazine as, you know, ingredient or flavorant number 24. That acetylpyrazine happens to be, as disclosed by Adams, the most commonly used acetylpyrazine flavorant. So, I think that provides a strong motivation to make that combination. And then, Adams also goes on to say that acetylpyrazine is recognized as being generally recognized as a safe standard flavorant, which G.M. Alva also recognizes is a desired characteristic to use something that's generally recognized as safe. That's also consistent with Roger Gopalan's specification. If you look at Roger Gopalan's spec at APPX23, it talks about how there's an enormous number of molecules that can be used and that would work, but one of the limiting factors is you want to use something that's generally recognized as safe. And G.M. Alva and Adams both disclose that particular feature. So, I think the combination is quite strong. There's a lot of evidence that supports that determination. And then, on the counter side, there is no evidence of unexpected results. There's no teaching away evidence. Roger Gopalan does make this long-felt need argument, but as the board and the examiner found, it's unsupported by evidence. And even if you take that argument on the merits, he's talking about how the prior was using these physical tamper-resistant packaging methods to avoid this, you know, illegal conversion to methamphetamine. And the problem solved was allegedly having this chemical inhibition. But as Roger Gopalan's counsel seemed to concede, G.M. Alva discloses that particular feature. Mr. McBride, this is Judge Bryson. One thing that struck me, and I'd like you to comment on this, is that the examiner, having—although the examiner wrote quite a bit, she did not focus in on the inhibition of the reduction. Instead, she seemed to focus on the interference with the isolation part of the process, which, as I understand the chemistry here, was a quite different stage of the process from the reduction. It's step one as opposed to step two. Is there any—am I missing something in what the examiner did, or did the board and your brief walk away from the analysis of the examiner? So, I think the examiner, you're correct, the examiner did focus more of their attention on the fact that by adding the amine odorants, you can create this bad smell. And that bad smell, even if you add the amine odorant in a much smaller amount, that's still going to deter people from, you know, doing this illegal conversion because it's going to tip off police. It's going to tip off potential buyers. There was nothing in the examiner's—there was nothing in the examiner's office action that I saw that addressed the inhibition, i.e., the interference with the reduction part of the GMALVA disclosure, right? Well, the examiner did cite to paragraph 47 of GMALVA, which does disclose both of those So, the examiner did cite the office action to paragraph 56, specifically reciting to GMALVA's disclosure of using the one-to-one ratio to achieve the effective amount that is claimed. So, I think you're—it is accurate to say that the examiner did talk about how the combination could create this odor that could deter. The examiner also found that GMALVA in paragraph 56 disclosed adding this amine odorant in the amount that is claimed. And the examiner pointed out that, you know, this is a composition claim. And once you add that amine odorant of atoms in the amount that's disclosed by GMALVA, you have the same composition. And, you know, that's all that's required to meet the claims. And they went on to say that, you know, in addition to what GMALVA talks about how they disclose this, the fact that adding in that amount is going to chemically inhibit the reaction, the examiner also pointed out that, and the board recognized that, once you have that composition, any properties associated with that particular composition, such as inhibiting the chemical reaction, is necessarily going to flow from that—from the fact that you have the same composition. And that's at least sufficient to shift the burden to the applicant to then attempt to show that that combination or that resulting composition would not have the claim properties. And here, there doesn't seem to be any disputes or any allegation that the composition resulting from the composition would have the, you know, the claim property of chemically inhibiting the conversion of pseudoephedrine to methamphetamine. Does that answer your question? Thank you. Mm-hmm. Brad, do you have anything else? No, I think that sums up the rejection. Unless there are any further questions from your honors, I'm happy to yield the rest of my time. Hearing none, we'll hear from Mr. Green for rebuttal. You have three minutes, Mr. Green. All right. Thank you again. And I will just return to what I've said before, which is, in this specification, there is a lot of talk about what could be done, and additives are certainly discussed. You're talking, for example, to paragraph 56. And it does talk about this wide range and how it can be used, but it doesn't say for what purpose. And I still have the position that there is nothing in this specification, whether taken alone or in combination, that gives you what is required by the claim, which is, you have to be able to know what it is that's going to work in the formulation at what amount in order to obtain a reduction as is set forth in this claim. And there is nothing in here that shows any action of that sort where there's actually a reduction that's taking place. And I again go back to the only thing that's in the specification are the examples 2, 3, 4, 5, and 6. And there's only one of those that has an amine in it. And that's example 2. And in that situation, there was five times as much presence with respect to the subafedrin than there was the ingredient that was being added to it. So in this situation, there was no one-to-one ratio whatsoever that was used. And obviously, at that point, it was also not generating it for the purposes, then, of converting it to methamphetamine. And without some basis for a PULSA to look at this and understand what is happening or what would be needed in order to accomplish what is set forth in Claim 1 of the pending application, we leave the PULSA totally without any understanding. That's our view. Okay. Thank you, Mr. Green. And thank you to Mr. Bride as well. The case is submitted. Thank you. The Honorable Court is adjourned until tomorrow morning at 10 a.m.